# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                    No. CR 19-1819 JB

STEPHEN DYE,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Objections to Pre-Sentence Report, Motion for Departure and Variance from Guidelines, and Sentencing Memorandum, filed December 2, 2019 (Doc. 34)("Objections"). The Court held a sentencing hearing on January 2, 2020. The primary issues are: (i) whether Defendant Stephen Dye should be granted an additional eight or nine days of presentence confinement credit for time spent in the State of New Mexico's custody; (ii) whether the Presentence Investigation Report, filed November 12, 2019 (Doc. 29)("PSR"), should include as offense conduct two separate, pending charges brought in Texas, because the offenses, although unrelated, involve felony possession of firearms and drug trafficking; (iii) whether the 6-level enhancement under § 2K2.1(b)(1)(C) of the United States Sentencing Guidelines Manual ("U.S.S.G." or "Guidelines") for committing an offense involving twenty-five to ninety-nine firearms applies, because law enforcement found approximately fifty-five to eighty firearms in Dye's home; (iv) whether the 2-level enhancement under § 2K2.1(b)(3)(B) of the Guidelines for possession of a destructive device applies, because law enforcement found a hand grenade in Dye's home; (v) whether the 1-level enhancement under § 2K2.1(b)(3)(B) of the Guidelines applies, because many of the firearms found in Dye's home

were stolen; (vi) whether the PSR overstates Dye's criminal history, because it includes some factual errors about past offenses; (vii) whether the 4-level enhancement under § 2K2.1(b)(6)(B) of the Guidelines applies, because Dye was involved in drug trafficking; (viii) whether, if the Court declines to sustain Dye's objections to the sentencing enhancements, the Court should continue the sentencing until Kyle McDonald, who is currently awaiting trial, can no longer assert his right to remain silent under the Fifth Amendment to the Constitution of the United States of America; (ix) whether the Court should grant Dye a downward departure or a variance, because of his disability status, the impact that the PSR's sentencing range calculation would have on his family, and the disparities that might result between his sentence and McDonald's, who faces similar charges in state court and may receive a lesser sentence; and (x) whether the Court should allow Dye to voluntarily surrender to authorities. The Court concludes that: (i) although the Court has no authority to tell the Bureau of Prisons ("BOP") how to calculate Dye's time served in custody, the Court will make certain that the PSR's face page accurately reflects the time he has served; (ii) the separate Texas charges are relevant, because they involve similar crimes that allegedly occurred less than two months before the charge in this case; (iii) the 6-level enhancement under § 2K2.1(b)(1)(C) of the Guidelines is appropriate, because numerous firearms were found in plain sight throughout Dye's home; (iv) the 2-level enhancement under § 2K2.1(b)(3)(B) of the Guidelines applies, because a hand grenade was found in plain sight in Dye's home; (v) the 1-level enhancement under § 2K2.1(b)(3)(B) of the Guidelines applies, because many of the firearms in his home were stolen; (vi) the PSR does not overstate Dye's criminal history, because the PSR places Dye in criminal history category I, which is the lowest criminal history category; (vii) the 4-level enhancement under § 2K2.1(b)(6)(B) of the Guidelines applies, because the evidence indicates that Dye's firearm possession was connected to drug trafficking; (viii) although the Court

determines that McDonald's testimony would not prevent any of the four sentence enhancements from applying, the Court hesitates to deny Dye's request for a continuance; (ix) Dye's disability status, the impact that the PSR's sentencing range calculation would have on his family, and the disparities that might result between his sentence and McDonald's are not adequate bases for granting a downward departure; and (x) Dye is not entitled to voluntary surrender, because he has not met his burden of showing, by clear and convincing evidence, that he will not flee and that he does not pose a danger to others. Accordingly, the Court overrules in part and sustains in part Dye's Objections.

The PSR elaborates on the offense conduct, providing:

12. On November 23, 2018, a state trooper initiated a traffic stop with a speeding vehicle in Clay County, Texas. The trooper contacted the driver, later identified as the defendant, and the passenger, later identified as Karlie Randa Lee. The officer observed a strong odor of marijuana coming from the vehicle. When asked if there were any illegal substances inside the vehicle, the defendant advised that Lee possessed a marijuana joint. Lee admitted to having the joint and gave it to the trooper. She was arrested for possession of marijuana.

13. The defendant initially denied having any weapons in the vehicle, but then admitted to having a pistol strapped to his leg. The defendant was placed into handcuffs and detained. While conducting a pat down, the weapon was removed for safety and the trooper also found a set of brass knuckles in the defendant's back pants pocket.

14. The defendant's vehicle was searched and the following items were seized: 19 grams of methamphetamine, three rifles, two handguns, multiple smoking devices, marijuana in Lee's purse, 90 grams of methamphetamine, a scale, 47 grams of morphine, six ecstasy pills, 16 orange capsules labeled M. Amphet Salts 20 mg (capsules found to contain amphetamine), large quantity of different colored baggies, 1,398 rounds of assorted ammunition to include large capacity magazines, and $1,185 in cash.

15. The type of firearms seized were: (1) Ruger P95DC 9mm, (2) S&W SD9VE 9mm, (3) Star Firestar 9mm, (4) American Tactical .556, High Tower Armory 9mm, and (5) Rock River Arms LAR 15 .556 (a semiautomatic firearm capable of accepting large capacity magazines with high capacity

magazines in close proximity to the firearm).

16. The defendant was arrested on the above charges and placed into custody. The defendant had $757 in cash inside his wallet upon arrest. This case remains pending in Texas (see Case Nos. CR-15588, CR-15589, and JP-2018-328). However, it is included as relevant conduct due to this offense being part of the same course of conduct. This offense represented a connected offense that included a degree of similarity to the federal offense (large quantity of firearms, ammunition, and drugs: methamphetamine and marijuana) and temporal proximity to the federal offense (less than two months apart).

17. On January 3, 2019, the San Juan County Sheriff's Office (SJCSO) began investigating several individuals who had been repeatedly involved in criminal activity in the Farmington, New Mexico area. The defendant, Stephen Dye, was identified early as a person who associates with a criminal group involved in multiple crimes to include aggravated batteries, burglaries, drug trafficking, and firearm transactions. Dye had been convicted of felony offenses to include: Possession of a Controlled Substance, Forgery, Distribute Controlled Substance, Aggravated Burglary, and Larceny of a Firearm. SJCSO obtained a search warrant on January 8, 2019. This warrant allowed SJCSO to search for letters, documents, photos, and phones for evidence of other crimes occurring in Farmington. SJCSO had probable cause to suspect Dye was involved in dealing drugs.

18. On January 8, 2019, the SJCSO executed a search warrant on the residence of Stephen Dye at 2111 Heights Dr. in Farmington, New Mexico. During the search, officers confirmed that an individual named Kyle McDonald was residing at Stephen Dye's residence as well. While serving the warrant, multiple firearms and narcotics were observed in plain view throughout the residence. Law enforcement observed a pump shot gun in Dye's bedroom and firearms on the floors of the two-story residence. Marijuana (weight unspecified) was located in a back bedroom and methamphetamine was located inside one of Kyle McDonald's shoes. The total weight of the methamphetamine was 18.07 grams. Based on these observations and after confirming that Stephen Dye was a convicted felon, law enforcement obtained a second warrant to search for firearms and drugs.

19. After obtaining the second warrant, law enforcement continued the search on the same date. In Dye's bedroom, SJCSO found multiple plastic baggies containing a large amount of suspected marijuana. Each bag of marijuana weighed approximately 30 grams, with a total weight of a quarter pound.

20. During the search for firearms, officers searched the garage and located a large quantity of firearms and firearm parts. It appeared that Dye and

McDonald were using the garage to either dismantle the firearms, and/or put them together. There were wooden rifle stocks piled into a box. There was also a small suitcase full of revolver parts.

21.     In another room (Room #4), officers located body armor which had a patch that read "Bullet" on it. "Bullet" is known to be Stephen Dye's moniker. Feet away from the body armor, officers found a live grenade sitting on a shelf. The grenade was later inspected and X-rayed and determined to be in functioning order. There were also several firearms found in Dye's bedroom. The pictures from the search warrant depict numerous firearms and firearm parts in the house. Law enforcement approximated anywhere from 55 to 80 firearms in the home. While not all firearms were tested for functionality, at least two of the firearms were test fired by law enforcement and functioned as designed.

22.     Dye was interviewed and waived his Miranda rights. He admitted there were guns in his house, specifically in the closet under the stairs. He provided a door code. Dye stated there was a shotgun in the bedroom behind the door, and his girlfriend had a .22 pistol at his house. Dye stated there was an SKS rifle in his closet, which he bought for $300. He also mentioned he had been stopped in Texas with methamphetamine and marijuana. At that time, he had an AR 15 and some pistols in his vehicle. Dye stated that most of the other rifles and gun parts found in the house were McDonald's that he got from his grandfather. Dye stated he went through several of McDonald's guns and some of them are in functioning condition. He stated that his DNA would be on several of the firearms because he helped take them apart and inspect them. Dye gave codes to the safe(s) and said that there was a 30.06 rifle in the safe.

23.     Dye mentioned to law enforcement that due to a motorcycle crash three years prior, he started using methamphetamine. He admitted to using 1.75 grams a day. He uses his roommate, Kyle McDonald, to distribute his narcotics. Dye states he buys an ounce, keeps a quarter for himself, and gives the rest to McDonald to sell to make money to afford their habits. Cash in the amount of $6,820 was in a safe in the upstairs hallway of the residence.

24.     It was determined that many of the firearms were stolen in December 2018 from Gordon Jones in Bloomfield, New Mexico. Gordon Jones has a son named Wiatt Jones, who is involved with Stephen Dye and Kyle McDonald's larger criminal organization which was the subject of the local investigation. In late December 2018, Gordon and Wiatt were in an altercation with each other. During that altercation, Wiatt let it slip that he had stolen Gordon's guns. Gordon then found that the safe at his residence had been grinded down and broken into and a large quantity of firearms

were missing. He stated the safe could hold up to 60 or more firearms. Gordon stated that the firearms were all old WWI and WWII type rifles, and that his father used to be a gunsmith, which is how he obtained so many firearms.

. . .

29. McDonald was later charged in the Farmington District Court (Case No. D-1116-CR-201900489) with Racketeering; Conspiracy to Commit Bribery of a Witness; Conspiracy to Commit Trafficking (By Distribution -- Methamphetamine); Non-Residential Burglary; Criminal Damage to Property; Possession of a Controlled Substance; and 78 counts of Larceny of a Firearm. This case was dismissed.

30. On January 3, 2019, an associate of the defendant, Chad Cordell, made a call from jail to McDonald's phone. Early in the conversation, the phone is handed to Dye, and Dye and Cordell speak about a possible firearm transaction. In apparent reference to being able to provide Cordell with some "Winchinchesters" (a Winchester brand firearm), Dye states, "Alright, we went to the flea market," and then laughs. Cordell asks, "So you got a assortment of them?" Dye responds, "Yea, were [sic] talking one offs, handmade, beautiful."

31. Upon inspection of Gordon Jones' residence, officers observed some wooden stocks of older rifles, just like what had been located at Dye's residence. These stocks were also located in the same type of boxes that were located at Dye's residence.

32. The pictures taken at the search warrant show numerous old firearms and firearm parts. Some of the weapons did not have serial numbers, but it is unclear whether they were obliterated, or whether the firearms were manufactured prior to requiring serial numbers.

33. In summary, the defendant, a convicted felon and substance abuser, knowingly possessed firearms while trafficking controlled substances and firearms.

PSR ¶¶ 12-24, 29-33 at 4-7. On September 12, 2019, Dye pled guilty to "a violation of 18 U.S.C.

§§ 922(g)(1) and 924, that being Felon in Possession of a Firearm." Plea Agreement, filed

September 12, 2019 (Doc. 26)

Dye argues that he should be granted eight or nine days of presentence confinement credit,

because he "was arrested . . . on January 30 or 31, 2019, then due to injuries incurred in the arrest he was flown to Albuquerque where he underwent surgery" before being "released on February 7, 2019." Objections at 1. Although the United States does not respond to Dye's request, the United States Probation Office ("USPO") agrees that the Court should grant Dye eight days of additional credit, bringing Dye's total time in custody to twelve days. See Addendum to the Presentence Report at 1, filed December 18, 2019 (Doc. 36)("Addendum"). The Supreme Court of the United States held, in United States v. Wilson, 503 U.S. 329 (1992), that district courts do not have the authority under 18 U.S.C. § 3585(b) to compute a sentence credit at sentencing for time served in pretrial detention. See United States v. Wilson, 503 U.S. at 331-32. Rather, the Attorney General, through the BOP, must make credit awards after sentencing. "In so holding, the [Supreme] Court recognized that under § 3585(b), Congress has indicated that computation of the credit must occur after the defendant begins his sentence. A district court, therefore, cannot apply § 3585(b) at sentencing." United States v. Jenkins, 38 F.3d 1143, 1144 (10th Cir. 1994)(alterations omitted)(citations omitted)(internal quotation marks omitted). While the BOP -- and not the Court -- is the one who makes the determination of credit for time served, see United States v. Rodriguez, No. CR 11-0288 JB, 2011 WL 6831907, at *8 (D.N.M. Dec. 28, 2011)(Browning, J.), the Court strives to make the PSR's face page accurate. Accordingly, the Court will edit the face page to reflect that Dye has been in custody for eight additional days.

Dye challenges the USPO's calculation of his total offense level in the PSR. The PSR calculates Dye's base offense level as 20 for felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). See PSR ¶ 38, at 1. The PSR applies four enhancements to Dye's base offense level: (i) increase by 6 levels for an offense involving twenty-five to ninety-nine firearms, see PSR ¶ 39, at 8 (citing U.S.S.G. § 2K2.1(b)(1)(C)), because law enforcement found numerous firearms

in Dye's home; (ii) increase by 2 levels for possession of a destructive device, because law enforcement found a hand grenade in Dye's home, see PSR ¶ 40, at 8 (citing U.S.S.G. § 2K2.1(b)(3)(B)); (iii) increase by 1 level, because many of the firearms in Dye's home were stolen, see PSR ¶ 41, at 8 (citing U.S.S.G. § 2K2.1(b)(4)); and (iv) increase by 4 levels, because Dye possessed firearms in connection with drug trafficking, see PSR ¶ 42, at 8 (citing U.S.S.G. § 2K2.1(b)(6)(B)). The PSR also reduces Dye's offense level by 2 levels, because Dye has "clearly demonstrated acceptance of responsibility for the offense," PSR ¶ 48, at 9 (citing U.S.S.G. § 3E1.1(a)), and by 1 level, because Dye has "assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty," PSR ¶ 49, at 9 (citing U.S.S.G. § 3E1.1(b)). Accordingly, the PSR calculates Dye's total offense level as 30. See PSR ¶ 50, at 9. With a total offense level of 30 and a criminal history score of I, see PSR ¶ 58, at 15, the Guidelines imprisonment range is 97 months to 121 months, see PSR ¶ 114, at 27. The maximum sentence that the statute authorizes is ten years, see PSR ¶ 113, at 27; 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and therefore the Guidelines range is 97 months to 120 months, see PSR ¶ 114, at 27 (citing U.S.S.G. § 5G1.1(c)(1)).

Dye argues that his base offense level should be 20, with 3 points subtracted for acceptance of responsibility, for a total offense level of 17. See Objections at 2. A total offense level of 17 and a criminal history category of I results in a Guidelines range of 24 months to 30 months. See Objections at 2. Dye asserts that his total offense level should be 17, because: (i) the PSR's paragraphs 12, 16, 61, and 62 refer to two misdemeanors and one felony that arise from an unrelated vehicle stop in Texas, which the Texas authorities have not pursued, see Objections at 1; (ii) he is less culpable than McDonald, whom Dye contends stole most of the firearms found in Dye's house and brought a hand grenade into his house without Dye's knowledge, see Objections

at 2-5; (iii) the PSR overstates his criminal history, <u>see</u> Objections at 5-6; (iv) his possession of firearms was not related to drug trafficking, <u>see</u> Objections at 6; (v) he is enrolled as a full-time student at San Juan College, <u>see</u> Objections at 6; (vi) he is "fully disabled," Objections at 6-7; and (vii) the PSR overstates the value of his total assets, <u>see</u> Objections at 7. If the Court decides not to sustain his objections to the PSR's enhancements, Dye requests that the Court continue his sentencing until McDonald, who is awaiting a jury trial set to begin on February 20, 2020, can no longer assert his right to remain silent under the Fifth Amendment. <u>See</u> Objections at 7-8.

As to Dye's objection to the PSR's reference to offense conduct in Texas, the Court concludes that the offense conduct is relevant, because the charges involve similar offenses -- unlawful possession of firearms and drug trafficking. The PSR's paragraph 61 refers to a pending Texas case for unlawful carrying of a weapon and possession of a prohibited weapon. <u>See</u> PSR ¶ 61, at 15-16. The PSR's paragraph 62 refers to a pending Texas case for manufacture or delivery of illegal substances, and for unlawful possession of a firearm by a felon. <u>See</u> PSR ¶ 62, at 16. The Court determines that the charges in both cases remain pending. <u>See</u> Addendum at 1. Although this offense conduct occurred over a year ago on November 23, 2018, <u>see</u> PSR ¶¶ 61-62, at 15-16, the conduct occurred less than two months before Dye's conduct alleged in this case, <u>see</u> Indictment at 1, filed June 27, 2019 (Doc. 1); Addendum at 1-2. The United States argues that "the Court need not take the Texas matter into consideration when making this determination, because there is ample evidence that the defendant was trafficking narcotics without it." United States' Response to Defendant's Objections to the PSR and Motion for Departure and Variance, and Sentencing Memorandum, filed December 6, 2019 (Doc. 35)("Response"). The Court determines that, although the contested charges are pending, their similarity and proximity to this case renders these charges relevant. The Court further concludes that, as discussed below, even if

the offense conduct is not relevant, there is abundant evidence connecting Dye's firearm possession to drug trafficking.

Dye argues that the enhancements in the PSR's paragraphs 39 and 40 should not apply, because he did not know that McDonald brought multiple firearms and a hand grenade into his home. See Objections at 2-4. Dye also argues that he did not know that the firearms were stolen, and thus the enhancement in the PSR's paragraph 41 should not apply. See Objections at 5. The PSR's paragraph 39 increases Dye's offense level by 6 levels for an offense involving twenty-five to ninety-nine firearms, because law enforcement found between fifty-five and eighty firearms in Dye's house, see PSR ¶ 39, at 8 (citing U.S.S.G. § 2K2.1(b)(1)(C)); paragraph 40 increases Dye's offense level by 2 levels for possession of a destructive device, because Dye possessed a hand grenade, see PSR ¶ 40, at 8 (citing U.S.S.G. § 2K2.1(b)(3)(B)); and paragraph 41 increases Dye's offense level by 1 level, because many of the firearms that Dye possessed were stolen, see PSR ¶ 41, at 8 (citing U.S.S.G. § 2K2.1(b)(4)). The United States Court of Appeals for the Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[1] See United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *7

_____

[1]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since characterized its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(quoting United States v. Olsen, 519 F.3d at 1105). See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v.

(D.N.M. June 26, 2012)(Browning, J.). A defendant may assert an error only where the fact at issue increased his sentence beyond the statutory maximum. See United States v. O'Flanagan, 339 F.3d 1229, 1232 n.2 (10th Cir. 2003)(holding that a defendant could not assert an error, because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, 592 F. App'x 699, 705 (10th Cir. 2014)(unpublished)[2]("It is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence."); United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.)(holding that a district court may determine advisory sentencing

---

Washington, 11 F.3d at 1516)). The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that the Court did not need to determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation). See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (concluding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

[2]United States v. Hendrickson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that United States v. Hendrickson, 592 F. App'x 699 (10th Cir. 2014)(unpublished), and United States v. Madoff, 316 F. App'x 58 (2d Cir. 2009)(unpublished), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

factors by a preponderance of the evidence). Further, the Tenth Circuit determined that a district court could use its own finding on drug quantity to enhance a defendant's Guidelines range consistent with Alleyne v. United States, "so long as the court does not use its own drug quantity finding to alter the defendant's *statutory* sentencing range." United States v. Cassius, 777 F.3d 1093, 1094 (10th Cir. 2015)(emphasis in original).

The Court concludes that a preponderance of the evidence supports the application of the enhancements in the PSR's paragraphs 39, 40, and 41. According to the PSR, "multiple firearms and narcotics were observed in plain view throughout [Dye's] residence." PSR ¶ 18, at 5. For example, law enforcement found "multiple plastic baggies containing a large amount of suspected marijuana" in Dye's bedroom, PSR ¶ 19, at 5, and a "large quantity of firearms and firearm parts" in Dye's garage, PSR ¶ 20, at 5. Moreover, law enforcement found a hand grenade in a room "[f]eet away" from body armor containing a label with Dye's moniker, "Bullet." PSR ¶ 21, at 5. Law enforcement later discovered that many of the firearms in Dye's home "were stolen in December 2018 from Gordon Jones in Bloomfield, New Mexico." PSR ¶ 24, at 6. That law enforcement located firearms and a hand grenade within plain view upon searching Dye's home contradicts Dye's argument that he did not know that McDonald brought these items into his home. Moreover, although Dye argues that he did not know that the firearms were stolen, see Objections at 5; PSR ¶ 41, at 8, whether Dye knew that the firearms were stolen is irrelevant. Section 2K2.1(b)(4) of the Guidelines instructs that, "[i]f any firearm [] was stolen, increase by 2 levels." U.S.S.G. § 2K2.1(b)(4). Thus, the enhancement does not hinge upon knowledge. See U.S.S.G. § 2K2.1(b)(4), Application Note 8 (stating that "[s]ubsection (b)(4) applies regardless of whether the defendant knew or had reason to believe that the firearm was stolen or had an altered or obliterated serial number"). In addition, the charged offense is for felon in possession of a firearm,

see 18 U.S.C. § 922(g)(1), and therefore ownership of the firearms is not required, see Response at 2-3. Nevertheless, the Court determines that, even if § 2K2.1(b)(4) contained a knowledge component, the text messages exchanged between Dye and McDonald establish that Dye knew that the guns were stolen. See PSR ¶¶ 26-28, at 6-7. Because the sentencing facts indicate that Dye possessed stolen firearms and a destructive device in his home, the Court concludes that the enhancement applications under §§ 2K2.1(b)(1)(C), 2K2.1(b)(3)(B), and 2K2.1(b)(4) of the Guidelines are appropriate.

Dye argues that the PSR overstates his criminal history, because he has never been convicted of drug distribution -- only drug possession -- as stated in the PSR's paragraphs 53 and 133, nor aggravated burglary as stated in the PSR's paragraph 56. See Objections at 5. Dye also asserts that the "reference in paragraph 54 to having 'reported to the probation office with a knife on his person' omits to note that defendant had a small pocket knife which he used for his work in his pocket; the knife was not seized and he was not prosecuted for that." Objections at 6 (quoting PSR ¶ 54, at 12). The USPO responds:

> After reviewing the Judgment in Case No. CR-2003-0144, it is noted the defendant was convicted of Possession of a Controlled Substance (Methamphetamine), a lesser offense than the original Distribution of a Controlled Substance charge. This change to paragraph 53 is made by way of this addendum. It is noted that Case No. CR-2003-0167 initially withheld adjudication but found the defendant guilty and convicted him of Forgery on May 19, 2003. Further, after reviewing the Judgment in Case No. CR-2006-0152, it is noted the defendant was convicted of Burglary, a lesser offense than the original Aggravated Burglary charge. This change to paragraph 56 is made by way of this addendum. In addition, the defendant's criminal history category remains at I.
>
> The United States Probation Office disagrees that the defendant's criminal history is "overstated" as the PSR merely reports the factual findings of court records.

Addendum at 2. Despite these minor corrections, the Court determines that the PSR does not

overstate Dye's criminal history. As the United States notes, the PSR places Dye in criminal history category I, which "is the lowest criminal history level there is, [and] which puts him in the same category as someone who has never been arrested." Response at 3-4. The Court concludes that, with the USPO's changes in its Addendum, the PSR accurately represents Dye's criminal history, which places him in criminal history category I.

Dye next argues that the 2-level enhancement under § 2K2.1(b)(6)(B) of the Guidelines in the PSR's paragraph 42 should not apply, because his firearms possession -- to which he pled guilty -- was not related to drug trafficking. See Objections at 6. According to Dye, he has "never been convicted of drug trafficking." Objections at 6. The United States counters that whether Dye has been convicted of drug trafficking is irrelevant. See Response at 4. The United States argues that the evidence shows:

> [a]t the time the defendant was arrested with the guns, the San Juan County Sheriff's Office was investigating him for narcotics trafficking. Indeed, the defendant admitted to law enforcement at the time of his arrest that he uses Kyle McDonald to distribute his narcotics. The defendant stated that he buys an ounce of methamphetamine, keeps a quarter ounce, and then gives the other three quarters to McDonald to sell in order to make money to buy more and afford their drug habits. He stated he keeps the profit off the dope after the original ounce is paid for. He stated the most methamphetamine he has had in his possession at one time was approximately four ounces. The defendant stated that someone from Albuquerque brings the narcotics to him, and referred to the dealer's house in Albuquerque as "torture house." Additionally, the defendant named others who also bring narcotics to his house, specifically he was brought ten pounds over Christmas, but stated he only bought or kept two ounces at that time. He stated that he pays this person up front and that he comes about every weekend.

Response at 4-5. Furthermore, the USPO notes that Dye "admitted to trafficking and there was evidence of trafficking on his cell phone and evidence he was trafficking just two months prior to the instant offense." Addendum at 3. The Court concludes that a preponderance of the evidence indicates that Dye possessed firearms in connection with trafficking drugs. First, Dye does not

refute that evidence exists showing that he was trafficking drugs.  <u>See</u> Objections at 6.  The mere assertion that he has never been convicted of drug trafficking does not foreclose the application of § 2K2.1(b)(6)(B) of the Guidelines.  Second, "narcotics were observed in plain view throughout [Dye's] residence."  PSR ¶ 18, at 5.  Specifically, law enforcement found several quarter-pound bars of suspected marijuana in Dye's bedroom.  <u>See</u> PSR ¶ 19, at 5.  The Court concludes that the enhancement application under § 2K2.1(b)(6)(B) of the Guidelines is appropriate.

Dye requests that, if the Court decides not to sustain his objections to the PSR's enhancements, the Court continue his sentencing until McDonald, who is awaiting a jury trial on February 20, 2020, can no longer assert his right to remain silent under the Fifth Amendment.  <u>See</u> Objections at 7-8.  Dye maintains that "McDonald's attorney has advised undersigned counsel that he does not intend to seek a postponement from the February 20, 2020, trial date now set, and anticipates a resolution of McDonald's case by then, either by trial or otherwise."  Reply to United States' Response to Defendant's Objections to Pre-Sentence Report, Motion for Departure and Variance from Guidelines and Sentencing Memorandum (Document 35) and Reply to United States Probation Office's Addendum to the Pre-Sentence Report (Document 36), filed December 23, 2019 (Doc. 37)("Reply").  The United States objects that a "continuance should not be granted so that defense counsel can secure irrelevant testimony."  Response at 5.

The Court does not believe that McDonald's testimony will affect the four sentence enhancements' applicability, but the Court does not deny Dye's request for a continuance at this time.  First, as to the 6-level increase for an offense involving twenty-five to ninety-nine firearms, <u>see</u> PSR ¶ 39, at 8 (citing U.S.S.G. § 2K2.1(b)(1)(C)), McDonald's testimony will not change the fact that law enforcement found many firearms strewn about McDonald's residence, <u>see</u> PSR ¶ 18, at 5.  Although Dye argues that he did not know that McDonald brought so many firearms into his

home, a preponderance of the evidence indicates that Dye knew or should have known of the firearms' presence in his home, because so many firearms were within plain view when law enforcement searched his residence. See PSR ¶ 18, at 5. Second, as to the 2-level increase for possession of a destructive device, see PSR ¶ 40, at 8 (citing U.S.S.G. § 2K2.1(b)(3)(B)), McDonald's testimony will not change the fact that law enforcement found a hand grenade, like the firearms, in plain view. Moreover, law enforcement found the hand grenade in a room "[f]eet away" from body armor containing a label with Dye's moniker, "Bullet," which indicates that Dye likely was aware that the hand grenade was in his home. PSR ¶ 21, at 5. Third, as to the 1-level increase, because many of the firearms in Dye's home were stolen, see PSR ¶ 41, at 8 (citing U.S.S.G. § 2K2.1(b)(4)), McDonald's testimony would not change the fact that the Guidelines do not require that Dye knew that he possessed stolen firearms, and, even if the Guidelines required knowledge, the Court determines that text messages exchanged between Dye and McDonald establish, by a preponderance of the evidence, that Dye knew that the guns were stolen. See U.S.S.G. § 2K2.1(b)(4), Application Note 8 ("Subsection (b)(4) applies regardless of whether the defendant knew or had reason to believe that the firearm was stolen or had an altered or obliterated serial number."); Response at 3. Fourth, as to the 4-level increase, because Dye possessed firearms in connection with drug trafficking, see PSR ¶ 42, at 8 (citing U.S.S.G. § 2K2.1(b)(6)(B)), the Court concludes that a preponderance of the evidence indicates that Dye possessed firearms in connection with drug trafficking, because drugs were found throughout Dye's home, see PSR ¶ 19, at 5, and because Dye "admitted to trafficking and there was evidence of trafficking on his cell phone and evidence he was trafficking just two months prior to the instant offense," Addendum at 3. Although the Court determines that McDonald's testimony would not prevent any of the four sentence enhancements from applying and that McDonald's testimony is thus irrelevant, the Court

hesitates to deny Dye's request for a continuance. Nevertheless, if Dye reads this opinion and thinks that McDonald's testimony will do him some good, the Court will consider his claim.

Dye next argues that the Court should grant a downward departure or variance, because of his letters of recommendation, his disability status, the impact that the PSR's sentencing range calculation would have on his family, and the disparities that might result between his sentence and McDonald's possible sentence, because McDonald may receive a lesser sentence in state court. See Objections at 8-11. Dye argues that the Guidelines "are only one of the factors set forth in 18 U.S.C. § 3553(a)" for Courts to consider when sentencing defendants. Objections at 9. According to Dye, his "'history and characteristics'" weigh in favor of a lighter sentence. Objections at 9 (quoting 18 U.S.C. § 3553(a)(1)). Dye emphasizes that he has "serious medical issues which make his incarceration more difficult than for others who face a similar felon in possession of a firearm charge and sentence." Reply at 8. Dye states that he

> was in a serious life-threatening motor vehicle accident on April 21, 2016. His motorcycle was hit by a one-ton handicapped van that pulled out in front of him on a four-lane road in Farmington[, New Mexico]. Mr. Dye went under neat the van and his body tore off the spare tire that was mounted underneath the van.
>
> This resulted in severe brachial plexus avulsion of the nerves in his right shoulder and arm, damage to his artery, and his right forearm was shattered. His right femur broke in a complicated compound fracture. He had six or seven surgeries immediately, and six more since. One surgery removed a major nerve, the axillary nerve, from his right leg which nerve was then placed in his right shoulder.
>
> . . . .
>
> As a result, the Social Security Administration has determined him to be 100% disabled.

Objections at 10. Dye also notes that he "has been the sole custody parent to his now-16 year old daughter since she was age 4." Response at 8. Furthermore, Dye notes that "his criminal

convictions are all over 10 years old" and that he has "acquired a technical skill in auto mechanics." Objections at 9.

The United States objects to Dye's request for a downward departure variance. See Response at 5-7. The United States argues that "children are not leverage for a lesser sentence" and that Dye's home "is not appropriate for a teenage girl," because numerous stolen firearms and narcotics were found in his home, and because Dye allowed McDonald to live with him. Response at 6. As to Dye's argument that his sentence may be more severe than McDonald's state court sentence, the United States argues that "this argument is wholly inappropriate, and the Court is not to consider any purported disparities between state and federal sentences when granting a request for variance." Response at 6 (citing United States v. Beaver, 749 F. App'x 742, 749 (10th Cir. 2018)(unpublished)). Last, the United States argues that Dye's argument about his disability is unconvincing, because, since his motor vehicle accident, Dye has been "arrested in Texas for possessing firearms and methamphetamine," has "engaged in illegal conduct," and "fled from police on the day of his arrest, precipitating the events that caused his hospitalization that day." Response at 7. According to the United States, Dye's "disability has not prevented him from breaking the law, and should not be a justification for a downward adjustment." Response at 7.

After United States v. Booker, 543 U.S. 220 (2005), the Guidelines ranges are now advisory and are one of several factors that 18 U.S.C. § 3553(a) sets out. 534 U.S. at 245. Although appellate courts are allowed to assume that within-Guidelines sentences are reasonable, subject to rebuttal, see Gall v. United States, 552 U.S. 38, 50-51 (2007), the Supreme Court has made it clear that no presumption of reasonableness attaches at the district court level to the sentence the Guidelines suggest, see Gall v. United States, 552 U.S. at 50 (explaining that a sentencing judge "may not presume that the Guidelines range is reasonable"); Rita v. United

States, 551 U.S. 338, 351 (2007)("In determining the merits of [the parties'] arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

Section 3553(a) also directs sentencing courts to consider: (i) the offense's nature and the defendant's character; (ii) the available sentences; (iii) the sentencing guidelines and policy statements that the Sentencing Commission has promulgated; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims. See 18 U.S.C. § 3553(a)(1), (3)-(7). In determining a defendant's sentence, the Court has explained that it

> must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

United States v. Nolf, No. CR 10-1919-002, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.). Applying § 3553(a)'s factors, the Court has found that the case of an undocumented immigrant who re-entered the United States to provide for his two children and two siblings was not materially different from other re-entry cases, and thus, no variance from the guidelines sentence was warranted. See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.). On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although Jager's military service was not present to an unusual degree and thus did not warrant a departure, the Court determined that a variance was appropriate, because Jager's military service

was "superior and uniformly outstanding," as Jager appeared to have been "trustworthy[] and dedicated, and he served with distinction." 2011 WL 831279, at *14.

The Court concludes that it will not grant a downward departure. While the Court concludes that the requests for departure are authorized, they are not warranted in this case. The Court is having trouble squaring Dye's allegations of medical issues, disability status, and family concerns with Dye's long criminal history. In any case, the Court chooses not to depart, because the Court concludes that departure is not warranted under the facts and circumstances here. Unfortunately, our prisons house many people who have medical issues, disabilities, and family concerns. The Court has trouble distinguishing Dye and his case from many others before the Court, the other judges in this District, and district judges throughout the country. This case fits into the heartland of cases that this Court sees and that federal district courts around the country see. Even though the requested departures are authorized, under the facts of this case, the Court will exercise its discretion not to depart, because the case remains in the heartland that federal courts see. The Court will, however, take these departure requests into account when it considers the variance arguments.

Dye relies on United States v. Basurto, 117 F. Supp. 3d 1266 (D.N.M. 2015)(Browning, J.), for the proposition that "the Court's sentence should avoid unwarranted sentencing disparities among similarly situated defendants who have been convicted of similar crimes." 117 F. Supp. 3d at 1310 (citing 18 U.S.C. § 3553(a)(6)). According to Dye, "McDonald's case remains in state court, [so] this federal sentence should [] be reduced to take into account McDonald's far greater culpability and his likelihood of a far lesser sentence in state court." Reply at 6. The Court determines, however, that the need to avoid disparate sentences between similar defendants applies to defendants who face similar charges in federal court. Here, Dye asks the Court to consider

possible disparities between his sentence and that of a defendant in state court. The Tenth Circuit advises against this comparison.

> "Sentencing courts must consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been apply found guilty of similar conduct.' 18 U.S.C. § 3553(a)(6). But this does not mean that a sentence calculated under the Guidelines is unreasonable simply because it is harsher than a state-court sentence would be for a comparable crime. Federal and state authorities have concurrent jurisdiction over various offenses and may apply disparate punishments to similar conduct. Adjusting federal sentences to conform to those imposed by the states where the offenses occurred would not serve the purposes of § 3553(a)(6), but, rather, would create disparities within the federal system, which is what § 3553(a)(6) is designed to discourage. As the Fourth Circuit said in reversing a sentence that apparently considered state/federal sentencing disparities, '*The sole concern of section 3553(a)(6) is with sentencing disparities among federal defendants*. . . . The Guidelines [seek] to avoid only the unwarranted disparities that exist [ ] in the federal criminal justice system, that system for which the Guidelines are governing law.' *United States v. Clark*, 434 F.3d 684, 687 (4th Cir. 2006)."

United States v. Wiseman, 749 F.3d 1191, 1194 (10th Cir. 2014)(quoting United States v. Branson, 463 F.3d 1110, 1112 (10th Cir. 2006))(emphasis in United States v. Branson). See United States v. Chapman, No. CR 14-1065 JB, 2015 WL 10383583 (D.N.M. 2015)(Browning, J.)("'For the district court's ruling to be an error, state-federal disparities would have to be relevant under § 3553(a)(6), but they are not.'" (quoting United States v. Wiseman, 749 F.3d at 1196)); United States v. Begin, 696 F.3d 405, 413 (3d Cir. 2012)("State-federal disparities are simply irrelevant under § 3553(a)(6)."); United States v. Jeremiah, 446 F.3d 805, 808 (8th Cir. 2006)(holding that district courts are "neither required nor permitted under § 3553(a)(6) to consider a potential federal/state sentencing disparity"). The proper issue for the Court is whether the PSR's proposed sentencing range will create a disparity between Dye and "federal defendants sentenced under the federal sentencing guideline regime." United States v. Wiseman, 749 F.3d at 1196.

The Court also concludes that the impact of Dye's sentence on his family does not warrant

a downward departure.  In <u>Kimbrough v. United States</u>, 552 U.S. 85 (2007), the Supreme Court

held that

> a district court's decision to vary from the advisory Guidelines may attract greatest
> respect when the sentencing judge finds a particular case outside the heartland to
> which the Commission intends individual Guidelines to apply.  On the other hand,
> while the Guidelines are no longer binding, closer review may be in order when the
> sentencing judge varies from the Guidelines based solely on the judge's view that
> the Guidelines range fails properly to reflect § 3553(a) considerations even in a
> mine-run case.

552 U.S. at 89 (internal quotations and citations omitted).  The Court concluded in <u>United States</u>

<u>v. Almendares-Soto</u> that a defendant convicted of illegal re-entry into the United States was not

entitled to a downward departure or variance based on "his familial ties . . . and his familiarity to

life in the United States."  2010 WL 5476767, at *10.  The Court reasoned that the defendant's

"familial ties do not counsel departure from the Guidelines, because the presence of his children

and two siblings in the United States does not rise to the level of extraordinary circumstances."

<u>United States v. Almendares-Soto</u>, 2010 WL 5476767, at *10.  Here, Dye notes that he has "given

over legal guardianship of [his daughter] to his parents."  Objections at 8.  Many defendants, like

Dye, must give up guardianship over a child when they are incarcerated.  The Court concludes that

Dye's circumstances, while unfortunate, are not extraordinary or outside the heartland of cases,

and thus Dye's circumstances do not warrant a downward departure.  The Court will, however,

consider these factors and circumstances when it considers Dye's variance argument at the

sentencing hearing.

 The Court also concludes that Dye's disability status and his related medical issues do not

warrant a downward departure.  To support his argument that his medical issues warrant a lesser

sentence, Dye relies on <u>United States v. Basurto</u>.  In <u>United States v. Basurto</u>, the Court held that

the defendant's "'medical problems put downward pressure on her sentence. . . .  [I]t is generally

better to have health issues addressed outside of prison than inside. Also, prison time is harder on a defendant with health issues than one without them, and, thus, the Court may not need to sentence her to as heavy a sentence to effectuate the § 3553(a) goals.'" Reply at 7 (quoting United States v. Basurto, 117 F. Supp. 3d at 1273). Dye notes the following medical issues, which he contends have contributed to his disability status:

> Stephen Dye was in a serious life-threatening motor vehicle accident on April 21, 2016. . . .
>
> This resulted in severe brachial plexus avulsion of the nerves in his right shoulder and arm, damage to his artery, and his right forearm was shattered. His right femur broke in a complicated compound fracture. He had six or seven surgeries immediately, and six more since. One surgery removed a major nerve, the axillary nerve, from his right leg which nerve was then placed in his right shoulder.
>
> This accident resulted in the permanent paralysis of his right arm, hand, and shoulder. Because the artery providing blood to his right arm is impaired and subject to life-threatening blood clots, he is facing the amputation of his right arm; depending on whether that amputation is at the shoulder or lower on the arm will determine what kind of prosthetic device he could utilize.

Objections at 10. The United States counters that Dye's medical issues and disability status do not warrant a downward departure or variance. The United States argues:

> The defendant was disabled at the time he picked up these charges, at the time he was dealing drugs in Farmington, and at the time he was arrested with guns and narcotics in Texas. Clearly, it hasn't stopped him from criminal activity in the past, and we should not expect it will do so now. To the contrary, he has been supplementing his disability payments with drug money. This temptation will remain in the future.

Response at 5.

Congress directs courts to impose sentences "sufficient, but not greater than necessary," to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). When performing that task, courts need to consider: (i) the Guidelines; (ii) the nature of the offense as well as the defendant's history and characteristics; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims. See 18 U.S.C. § 3553(a)(1), (3)-(7).

The Court has considered all of these factors, and it will take these into factors account when it pronounces a sentence at the hearing. The Court will strive to craft a reasonable sentence, which, for a district judge tasked with balancing the § 3553(a) factors, means a sentence that is sufficient, but not greater than necessary to comply with the four purposes that 18 U.S.C. § 3553(a)(2) enumerates. Dye suffers major injuries resulting from his motorcycle crash, which he contends led him to start using methamphetamine. See PSR ¶ 23, at 6. The Court can address Dye's drug abuse and health issues through supervised release. See United States v. Joe, No. CR 16-4007, 2018 WL 4183764, at *8 (D.N.M. May 10, 2018)(Browning, J.). Accordingly, the Court will consider Dye's request for downward variance at the sentencing hearing.

Last, Dye requests a voluntary surrender. To support his request, Dye argues, in full:

When Mr. Dye was first indicted in this case, a warrant for his arrest was issued. Notwithstanding that, defense counsel arranged for Mr. Dye to come to Albuquerque on his own and appear at the U.S. Marshal's office to surrender as soon as the courthouse opened in the morning on the day of his arraignment, and he did do just that. Counsel was concerned that his medical condition would be exacerbated if he were to be handcuffed and kept in a transport vehicle for the several hour drive from Farmington to Albuquerque. Mr. Dye appeared for arraignment and was held in U.S. Marshal's custody one night where he was placed in Cibola County and had to sleep on the floor, a special challenge for a person with

his physical disabilities. Then he was released to La Posada halfway house, where he has been since July 12, 2019, and has " not had any compliance issues to date," per paragraph 10 of the PSR. If he were to be taken into custody at sentencing, then during the pendency of BOP designation, he would be in the same difficult conditions as the night he had to sleep on the floor, and he would face transportation in handcuffs by the U.S. Marshals to the designated facility. His propensity for blood clots precludes him being transported by airplane.

If the court were to grant him a voluntary surrender, he would pay for his own ground transportation to the designated facility. He requests a voluntary surrender.

Objections at 12. The United States objects to Dye's voluntary surrender request. See Response at 7. The United States argues that the "last time [Dye] drove to Texas, he took firearms and methamphetamine with him. The United States opposes any further opportunities for such conduct." Response at 7.

Under 18 U.S.C. § 3143(a):

**Release or detention pending sentence. -- (1)** Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence, other than a person for whom the applicable guideline promulgated pursuant to 28 U.S.C. 994 does not recommend a term of imprisonment, be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c). If the judicial officer makes such a finding, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c).

18 U.S.C. § 3143(a)(1) (bold in original). For pretrial detention, the "United States bears the burden of proving risk of flight by a preponderance of the evidence, and the burden of proving dangerousness by clear-and-convincing evidence." United States v. Enriquez, No. CR 11-1669 JB, 2011 WL 5220233, at *4 (D.N.M. Sept. 7, 2011)(Browning, J.)(citing 18 U.S.C. § 3142(e)). In contrast, for postconviction release, the burden shifts, and "§ 3143(a) places the burden on a defendant to demonstrate by clear-and-convincing evidence that he is not likely to flee or pose a

danger to the safety of others or the community." United States v. Enriquez, 2011 WL 5220233, at *4-5 (quoting United States v. Madoff, 316 F. App'x 58, 59 (2d Cir. 2009)(unpublished)).

The Court concludes that Dye has not met his burden of showing, by clear and convincing evidence, that he is "not likely to flee or pose a danger to the safety of any other person or the community." 18 U.S.C. § 3143(a).[3] Dye's only argument for voluntary surrender is that being taken into custody after sentencing would cause discomfort. See Objections at 12. Dye does not, however, offer any reasons why he would not be a flight risk or a danger to others. On the other hand, the United States contends that Dye might be a danger to others, because the "last time [Dye] drove to Texas, he took firearms and methamphetamine with him." Response at 7. Based on Dye's past arrests and the quantity of firearms and the destructive device found in Dye's home, the Court concludes that Dye might flee and poses a danger to the safety of others. When Dye was arrested in Texas, "he admitted to having a pistol strapped to his leg," and a pat down revealed "brass knuckles" in his pants pocket. PSR ¶ 13, at 4. A search of his car revealed more firearms and narcotics. See PSR ¶ 14, at 4. When law enforcement executed a second search warrant of Dye's home, they found between fifty-five to eighty firearms and a live hand grenade. See PSR ¶ 21, at 5. Dye has provided no evidence showing that he will not be a flight risk in the future or that he does not pose a danger to others. Because Dye has not shown, by clear and convincing evidence, that he is not a flight risk or that he poses a danger to others, see United States v. Enriquez, 2011 WL 5220233, at *5, the Court denies Dye's request for a voluntary surrender.

---

[3]Because the Court concludes that Dye should be detained under 18 U.S.C. § 3143(a)(1), it need not resolve whether to apply the more stringent standard for crimes of violence found in 18 U.S.C. § 3143(a)(2). If Enriquez cannot satisfy the burden under 18 U.S.C. § 3143(a)(1), he will not be able to satisfy the more stringent standard under § 3143(a)(2). See United States v. Enriquez, 2011 WL 5220233, at *5 n.2.

**IT IS ORDERED** that: (i) the objections in the Defendant's Objections to Pre-Sentence Report, Motion for Departure and Variance from Guidelines, and Sentencing Memorandum, filed December 2, 2019 (Doc. 34), are overruled in part and sustained in part; and (ii) the Defendant's requests for a downward departure are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
    United States Attorney
Letitia Carroll Simms
    Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

Tova Indritz
Tova Indritz Attorney at Law
Albuquerque, New Mexico

  *Attorney for the Defendant*